Filed 12/10/13  P. v. Jennings CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|   |   |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056095 |
| v. | (Super.Ct.No. RIF1104767) |
| ALEX JENNINGS III, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jean P. Leonard, Judge.

Affirmed in part; reversed in part with directions.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood, and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant, an 8-Trey Gangster Crips (8-Trey) member, and the victim, "Mister" Pride Hampton, had previously been in an altercation during which defendant had pulled a knife on Hampton. Four years later, Hampton saw defendant while attending a party at a friend's house. Defendant was angry with Hampton because he had been arrested as a result of the prior altercation. Defendant and Hampton exchanged words and defendant stabbed Hampton with a knife. At trial, Hampton denied defendant was the person who stabbed him despite identifying him prior to trial.

Defendant now contends on appeal as follows:

1.      The trial court erred in instructing the jury with CALCRIM No. 336 because Hampton was not an in-custody informant within the meaning of Penal Code section 1227A,[1] and such error implicated his right to a fair trial and due process under the federal constitution.

2.      The trial court was required to accept defendant's stipulation that 8-Trey is a criminal street gang and admission of evidence by the People showing it was a criminal street gang was prejudicial.

3.      The trial court erroneously instructed the jury with CALCRIM No. 520, because the jury could not find defendant guilty of attempted murder of Hampton based on a theory of implied malice.

---

[1]      All further statutory references are to the Penal Code unless otherwise indicated.

4. CALCRIM No. 604, defining attempted voluntary manslaughter on a theory of imperfect self-defense, creates an erroneous presumption in favor of attempted murder.

5. CALCRIM Nos. 371 and 372, regarding false evidence and flight, create inferences of guilt in violation of his due process rights under the federal constitution.

6. Insufficient evidence of premeditation and deliberation was presented to support the jury's true finding on the allegations.

7. The prosecutor committed misconduct during closing argument by committing *Doyle*[2] error, by improperly describing premeditation and deliberation, and by denigrating defense counsel.

8. Insufficient evidence was presented to support his conviction of active gang participation within the meaning of section 186.22, subdivision (a).

9. The trial court abused its discretion by refusing to dismiss his prior serious or violent felony conviction pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

10. The imposition of the $240 restitution fine pursuant to section 1202.4, subdivision (b) violated the prohibition against ex post facto laws.

We reverse defendant's conviction of violating section 186.22, subdivision (a) and reduce the restitution fine imposed, but otherwise affirm the judgment.

---

**2** *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*).

3

# I

## PROCEDURAL BACKGROUND

Defendant was convicted of attempted willful, premeditated and deliberate first degree murder (§§ 664/187, subd. (a); count 1) and assault with a deadly weapon (§ 245, subd. (a)(1); count 2). For these two counts, the jury found true the special allegations that defendant committed the crimes for the benefit of or at the direction of a criminal street gang (§186.22, subd. (b)); he personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)); and he personally caused great bodily injury (§ 12022.7, subd. (a)). Defendant was additionally found guilty of the substantive crime of active participation in a criminal street gang (§ 186.22, subd. (a); count 3.) After waiving his rights, defendant admitted that he had suffered one prior serious or violent felony conviction (§§ 667, subds. (c) & (e)(1), 1170.12, subd. (c)(1)).

Defendant was sentenced to state prison for the indeterminate term of 30 years to life for the attempted murder, plus 3 years for the great bodily injury enhancement, plus 1 year for the weapons use enhancement. The sentences on counts 2 and 3 were stayed. He received a total state prison sentence of 30 years to life, plus 4 years.

## II

## FACTUAL BACKGROUND

A.     *People's Case-in-Chief*

    1.     *Hampton's trial testimony*

"Mister" Pride Hampton was in custody for an unrelated robbery at the time he testified, and he was granted immunity by the People in exchange for his testimony. Hampton first met defendant in 1997 when they were both in the ninth grade at March High School in Moreno Valley.

On August 27, 2011, Hampton went to a party at a house located at 26201 Windemere Way in Moreno Valley that belonged to Brandon Blackmon.[3]  Hampton was with his best friend, Kaygan Williams.  Prior to going to the party, Hampton and Williams had been drinking alcohol, smoking marijuana and Hampton took Ecstasy. Hampton continued to drink at Brandon's house.

Hampton parked in front of the house.  During the party, two groups of men got into an altercation in the backyard of Brandon's house.  Hampton, Brandon and Williams tried to break up the fight but it escalated and moved to the front yard.  The fight continued into the middle of the street by Hampton's car.  Hampton and Williams went to move the car because Hampton was afraid it would be damaged.  Hampton heard some of the men saying "Blood" several times which Hampton believed was "gangbanging."

---

    [3]     Blackmon failed to appear at trial.

Hampton's car would not start so the hood was lifted up and Williams connected the battery cables to the battery. One of the men fighting began talking to Williams asking him what they were doing. Hampton opened the driver's side door of the car and reached in to try to start the car. Hampton heard one of the men say, "What is he grabbing for." Hampton then felt a sharp pain on his left side in the middle of his ribs. Hampton was stabbed. He turned to see who had stabbed him and saw a person with a knife pulling it away from him. The knife looked like an "outdoor" knife instead of a kitchen knife. It had a three- to four-inch blade. The person looked like defendant but Hampton insisted it was not him.

The person who stabbed Hampton said "Blood" again and started toward him again. Williams intervened. Williams and Hampton jumped in the car and drove off. Hampton drove himself to the hospital.

Hampton stayed overnight at the hospital. He was scheduled to have the stab wound stitched the day following the incident, but he left the hospital before they could perform the surgery. Medical records showed a cut on his spleen. He claimed that he left because the police were harassing him to name a suspect.

Hampton denied he told Riverside County Sheriff's Deputy Richard Stanley that defendant had stabbed him. He claimed that Deputy Stanley told him that defendant lived on the street where he was stabbed and that Deputy Stanley came up with the story

6

that defendant had stabbed him.[4]  Hampton never told Deputy Dartanan Scott that he talked to defendant that night or that defendant had stabbed him.  He never told Deputy Scott that defendant had previously pulled a knife on him.  Hampton was pressured to identify defendant as the person who stabbed him.  Hampton admitted circling defendant's picture in a six-pack photographic lineup but claimed he was told to do so by Deputy Stanley.

Hampton and defendant had been placed in holding cells next to each other prior to the preliminary hearing in this case.  Hampton told defendant he was sorry for what had happened and it was a big mistake.  Hampton did not recall defendant telling him that if he "did this right" he would get him a cell phone to use while he was in custody.  Defendant had not threatened Hampton while they were in custody.

2.    *Hampton's Statements to Police Prior to Trial*

At 10:00 p.m. on August 27, 2011, Deputy Scott spoke with Hampton at the hospital.  Hampton told Deputy Scott he had gotten into an argument with defendant.  Defendant's gang moniker (he was a member of 8-Trey) was "A-1."  Hampton told Deputy Scott that defendant had stabbed him.  Hampton told Deputy Scott that the argument started because, during a previous altercation with defendant, defendant had pulled a knife on him.

---

[4]    Hampton claimed Deputy Stanley came to his house 12 to 13 times after the stabbing.  Deputy Stanley testified he only went to Hampton's house twice.

7

Deputy Scott went to the location of the stabbing. Deputy Scott found no weapons and no blood at the scene. On August 28, at around 2:00 a.m., Deputy Scott attempted to find defendant at a residence nearby where it was reported he lived, but the deputy was unsuccessful.

An interview with Hampton that was conducted on August 28, 2011, was played for the jury. Hampton identified defendant as "A-1" and "Alex." He told Deputy Scott that defendant had pulled a knife on him during an incident prior to that night. He could not identify anyone from a six-pack photographic lineup shown to him by Deputy Scott.

Deputy Stanley prepared a new six-pack photographic lineup and showed it to Hampton. Hampton immediately identified defendant as the suspect from the photographic lineup.

Deputy Stanley had a belt recording of a conversation between him and Hampton that occurred on August 30. As to the prior altercation, Hampton stated that he had seen defendant in a park talking "shit" to some "kids." Hampton told defendant that if he was going to fight someone, he should fight him. Defendant pulled out a wallet and pretended it was a gun. When Hampton saw defendant the night that he was stabbed, he tried to talk to defendant about the prior altercation because he did not want to have any more problems with defendant. Instead, defendant stabbed him with the knife. Williams intervened and Hampton drove himself to the hospital. Defendant claimed 8-Trey to Hampton during the stabbing.

8

On August 31, 2011, Deputy Stanley picked up Hampton from his home and drove him to the Moreno Valley Police station. Hampton was cooperative and was never threatened. Hampton told Deputy Stanley he did not choose defendant's photograph in the first six-pack photographic lineup because defendant's skin color did not appear right. He also claimed he was worried about his injuries instead of finding who stabbed him.

Hampton was again interviewed at the station. He explained that the prior incident in the park happened four or five years ago. Defendant was "gang bangin" some high school kids. Defendant said he was from 8-Trey and would fight anyone on the park. Defendant pulled a knife on Hampton. Defendant then ran to his car and Hampton thought he may be grabbing a gun. Defendant came back and threatened Hampton that he was going to "blast" him. The police arrived and defendant was ordered down on the ground. Defendant was holding a wallet and not a gun.

The night of the stabbing, defendant drove up to a house across from where Hampton was with Williams; he was with his wife and children. Defendant came up to a crowd that Hampton was with and was talking to Williams. Defendant then recognized Hampton. Defendant said to Hampton, "cuz, you know, you snitched on me." Defendant then said 8-Trey several times and that it was "on." Hampton told him he was not afraid. Defendant then stabbed him with the knife.

A second interview was conducted on that same day. Defendant had been calling Hampton a snitch for the four years following the incident in the park. Hampton maintained that defendant had claimed 8-Trey and stabbed him. Hampton denied being a gang member. Hampton believed that defendant was trying to kill him. Hampton

9

identified defendant from the six-pack photographic lineup during the interview. Deputy Stanley found out Hampton had a warrant out for his arrest after he interviewed him and Hampton was arrested.

3. *Hampton's preliminary hearing testimony*

Hampton's preliminary hearing testimony was read to the jury. Hampton stated that he was testifying because he wrongly identified defendant as the person who stabbed him. Hampton got stabbed when Williams and another man were arguing. The person who stabbed him was yelling out "Blood." Hampton claimed he was on medication and had been drinking each time he was interviewed by Deputy Stanley, which caused him to misidentify defendant. In addition, Deputy Stanley told him his warrant would go away if he identified defendant. Defendant was not the person who stabbed him.

4. *Further investigation*

Defendant's grandmother lived at 26110 Windemere Way, which was just across the street from where Hampton was stabbed. There was no evidence found in defendant's room connecting him to the stabbing.

On November 28, 2011, Riverside County Sheriff's Deputy Michael Dean brought Hampton to the courtroom for the preliminary hearing. Hampton was in a holding cell near the courtroom. Defendant was placed in a cell next to Hampton. Deputy Dean heard defendant ask Hampton, "What are you going to do." Hampton responded, "I know what to do. I'm telling them it wasn't you." Defendant then told Hampton, "If you do what's right, I'll hook you up with a cell phone."

10

5.    *Gang evidence*

On September 8, 2010, Deputy Ernie Esquibel stopped a vehicle in which defendant was a passenger.  Defendant said his gang moniker was A-1.  He identified himself as an 8-Trey.  Defendant's room at the Windemere home contained gang apparel.

Deputy Levi Hart was a member of a Riverside County gang task force.  It was common for Los Angeles area gang members to relocate to Moreno Valley and keep their gang affiliation.  On December 16, 2010, he had contact with defendant.  Defendant identified his gang moniker as A-1.  He admitted he was an 8-Trey.  Defendant was "jumped" into the gang at the age of 14 years.

Los Angeles Police Officer Marlon Prodigalidad was a gang expert with particular interaction with the 8-Trey gang.  Respect for 8-Trey gang members was "everything." In order to gain respect, a gang member must commit violent acts such as shootings, robberies and burglaries.  A snitch was someone who talked to police.  Gang members who are victims of crimes will not cooperate with police because they will be deemed a snitch.  A snitch could be beat up or killed, even in jail.  The 8-Trey gang was part of the Crips and had a reputation for being violent.  Most victims of a gang crime are not cooperative because they fear retaliation from the gang.

Officer Prodigalidad recounted the history of the 8-Trey gang.  He indicated that there were "branches" of the gang in Moreno Valley.  Officer Prodigalidad also outlined the territory of the Los Angeles 8-Trey gang.  He described the various symbols that were used to identify the gang.  In Officer Prodigalidad's opinion, on August 27, 2011, 8-Trey

11

was an ongoing criminal organization. In Los Angeles alone, there were 350 to 400 members, and more than 2,000 members nationwide.

The common activities of 8-Trey included vandalism, selling narcotics, robberies, assaults and killing people. Two 8-Trey gang members had convictions of attempted murder and murder.

Officer Prodigalidad did not personally know defendant but had reviewed his records of contact with other law enforcement officers. He identified defendant's tattoos as being symbols of the 8-Trey gang. The clothes found in defendant's room during the search by Deputy Esquibel were gang attire. On June 13, 2011, he self-admitted to being an 8-Trey member and he was with another 8-Trey gang member.

Defendant's claiming of 8-Trey during the event in the park four or five years prior to the stabbing was to show others in the park he was a gang member. In Officer Prodigalidad's opinion, defendant was an active member of the 8-Trey gang. Based on a hypothetical similar to the facts of the instant crime, it was a typical crime committed on behalf of and at the direction of the gang. Further, a gang member would be obligated to take care of someone who was being a snitch against him.

Defendant presented no evidence on his own behalf.

III

CALCRIM NO. 336

Both parties agree that the trial court erred by instructing the jury with CALCRIM No. 336, the in-custody informant instruction. The People insist that since defendant requested that the trial court give the instruction, he invited the error. Defendant asserts

12

he received ineffective assistance of trial counsel if he is found to have invited the error. We have concluded, as set forth in more detail *post*, that the instruction was erroneously given; nonetheless, such error was harmless.

A.     *Additional Factual Background*

Prior to Hampton's testimony, he stated that he wanted to plead the Fifth Amendment. He was concerned he may incriminate himself based on the fact that this involved an altercation between him and defendant. The People objected that Hampton never invoked the Fifth Amendment when testifying at the preliminary hearing. The trial court allowed Hampton to invoke the Fifth Amendment. He was granted use immunity by the People in order to testify.

After Hampton had completed most of his testimony, the trial court advised the parties to look at CALCRIM No. 336. The trial court stated, "It's in custody informants. I want you to take a look at that because it does go to the issue of immunity agreements. [¶] And then there's also an additional issue here because there's an allegation that there was a conversation between the cells. And so that would also deal with that."

Defendant had no objection to the instruction. The People objected that the instruction did not apply. The trial court referred to the conversation between defendant and Hampton in the holding cells. Although Hampton agreed that they had spoken, the testimony differed from Deputy Dean. Defendant's counsel argued that although Hampton was a percipient witness, he was also an in-custody informant and he was given immunity for his testimony.

13

The trial court then read the notes with CALCRIM No. 336, and that the instruction must be given upon request. Defendant's counsel advised the trial court that he was requesting the instruction. The trial court ruled it was going to give the instruction, finding that "I think it's - - this is a strange situation because we have a victim who is not being cooperative, who's been given immunity, and whose memory is very questionable, who even this afternoon may be re-called. And we don't even know what he's going to say this afternoon. So I think that this instruction, although it may not fit the situation exactly, is probably something that should be given in order to protect the record on appeal. [¶] Also, to help the jury in trying to decide what to do with Mr. Hampton and how to handle his testimony, I think there's also something else in here that talks about how to deal with him in general. And they can consider the immunity agreement. [¶] Also I think it goes to the special instruction that the People have requested, that whole issue about his immunity and the possibility that he could be found in contempt, everything kind of meshes together. And I think that this is just one more instruction that might give them some guidance. So I'll go ahead and give it."

The jury was instructed with CALCRIM NO. 336 as follows: "The testimony of an in-custody informant should be viewed with caution and close scrutiny. In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of or expectation of any benefits from the party calling the witness. [¶] This does not mean that you may arbitrarily disregard such testimony, but you should give the weight to which you find it to be entitled in the light of all the evidence in the case. An in-custody informant is someone other than a co-defendant, percipient witness,

14

accomplice, or co-conspirator whose testimony is based on statements the defendant allegedly made while both the defendant and the informant were held within a correctional institution."

> B. *Instruction With CALCRIM No. 336*

By definition, CALCRIM No. 336 should not have been given in this case. The language of CALCRIM No. 336 is drawn from section 1127a, which provides that "an 'in-custody informant' means a person, other than a codefendant, percipient witness, accomplice, or coconspirator whose testimony is based upon statements made by the defendant while both the defendant and the informant are held within a correctional institution."

CALJIC No. 3.20 was the predecessor of CALCRIM No. 336. In discussing CALJIC No. 3.20, the California Supreme Court noted as follows: "An examination of the legislative history of section 1127a, which was enacted in 1989 and formed the basis for cautionary instruction CALJIC No. 3.20, reveals the Legislature made a deliberate and rational distinction between in-custody *percipient* witnesses and in-custody *informant* witnesses . . . . The Legislature recognized that in-custody informant witnesses differ in nature and character from in-custody percipient witnesses. Section 1127a and CALJIC No. 3.20 specifically distinguish between the two. In-custody informant witnesses have no personal knowledge of the crime, but testify that a defendant made an inculpatory statement to them while in proximity in a county jail or state prison, often in exchange for favorable treatment by law enforcement. In-custody percipient witnesses, by contrast, like other percipient witnesses, codefendants, accomplices, and

15

coconspirators, testify on the basis of personal knowledge of the crime. In-custody informant witnesses testify to a defendant's confession of guilt or admission of criminal behavior, and such evidence, if believed, carries great weight in the determination of guilt. In order to lessen the possibility of any conviction being based on fabricated testimony, the Legislature offered additional guidance to juries in criminal cases involving in-custody informants. (See Assem. Com. on Public Safety, coms. on Assem. Bill No. 278 (1989–1990 Reg. Sess.) 3d reading, as amended June 12, 1989.)" (*People v. Bivert* (2011) 52 Cal.4th 96, 120-121.)

Here, Hampton was a percipient witness. Moreover, as noted by respondent, Hampton never testified as to any statements made by defendant while they were in the holding cell. Hampton testified that he told defendant he was sorry for what had happened. He denied the testimony of Deputy Dean that defendant told him to do what was right and that he would get him a cellular telephone. No evidence was presented that Hampton was either a jailhouse informant or that his testimony was based in whole or in any part on anything he gleaned from being in the holding cell next to defendant. Rather, the record reveals that Hampton was simply a percipient witness to the crimes of which defendant was charged and happened to be in custody for an unrelated robbery. CALCRIM No. 336 specifically excludes a percipient witness from the definition of an in-custody informant. As such, we agree with the parties that the instruction should not have been given to the jury.

We note that defense counsel requested the instruction and that the notes for CALCRIM No. 336 at the time of his trial stated that the instruction should be given

16

upon request.  (Bench Note to CALCRIM No. 336 (2012) p. 119.)  However, the trial court must still instruct on the general principles of law relevant to the issues raised by the evidence.  (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)  Here, there simply was no evidence to support the instruction.

Respondent states that since defendant's counsel requested the instruction, defendant invited this error and cannot claim reversal is required on this basis on appeal. In anticipation of this argument, defendant argued in his opening brief that if the error was caused by his trial counsel, he received ineffective assistance of counsel.  In order to foreclose any ineffective assistance of counsel claim, we will consider whether giving CALCRIM No. 336 to the jury was prejudicial.

C.      *Prejudice*

Since we conclude that the instruction should not have been given to the jury, we must decide whether such error was prejudicial.  We conclude that it is not reasonably probable a result more favorable to defendant would have been reached absent the reading of CALCRIM No. 336.  (*People v. Watson* (1956) 46 Cal.2d 818, 836; see also *People v. Crandell* (1988) 46 Cal.3d 833, 870, abrogated on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346 [instructional error reviewed under *Watson*].)  In assessing the impact of instructions to the jury, "[w]e assume that the jurors are ""'intelligent persons and capable of understanding and *correlating* all jury instructions . . . given.'"" [Citation.]"  (*People v. Franco* (2009) 180 Cal.App.4th 713, 720.)

In his opening brief, defendant argued prejudice as follows:  "[T]he instruction advised the jurors that, in resolving the conflict between Hampton's prior statements to

law enforcement with his testimony at trial, the jurors should view the latter with skepticism, thereby virtually ensuring their adoption of the former. Because the earlier statements to the police identified [defendant] as the perpetrator, the effect of the instruction was to direct the jurors toward a conviction by telling them to question Hampton's trial testimony and to effectively adopt his initial version of events." The instruction does not so provide. The instruction clearly stated that the jury was to consider only those statements made by defendant to Hampton while they were in custody. As we noted *ante*, Hampton did not testify to any statements made by defendant. We presume the jury followed the instruction and did not consider Hampton's pretrial statements or trial testimony as being from an in-custody informant, if it even concluded that Hampton was an in-custody informant.

Moreover, we review the instructions as a whole to determine whether it is reasonably likely that the jury misconstrued them. (See *People v. Reliford* (2003) 29 Cal.4th 1007, 1013; *People v. Roybal* (1998) 19 Cal.4th 481, 526-527.)

The jury was instructed that it should consider all of the instructions together. The jury was given the standard instruction on evaluating the credibility of witnesses. It was told it should consider whether a witness made a prior inconsistent statement when considering the credibility. It was also told to consider whether the witness was promised immunity or leniency. CALCRIM No. 337 instructed the jury that although Hampton was in custody when he testified, the jury was not to speculate about the reason and "the fact that a witness is in custody does not by itself make a witness more or less believable." The jury was adequately instructed on how to view Hampton's testimony

18

and the fact the trial court erroneously added CALCRIM No. 336 did not impact his testimony.

On August 27, 2013, this court ordered the parties to file supplemental briefing as to whether the trial court not only erred by instructing the jury with CALCRIM No. 336, but in light of the fact that it did so instruct the jury, did it also error by not instructing the jury pursuant to section 1111.5 that they must find corroborating evidence for an in-custody informant's testimony.

"The corroboration requirement is set out in section 1111.5, which went into effect on January 1, 2012, and states, '(a) A jury or judge may not convict a defendant, . . . based on the uncorroborated testimony of an in-custody informant. The testimony of an in-custody informant shall be corroborated by other evidence that connects the defendant with the commission of the offense, . . . to which the in-custody informant testifies. . . . [¶] (b) As used in this section, "in-custody informant" means a person, other than a codefendant, percipient witness, accomplice, or coconspirator, whose testimony is based on statements allegedly made by the defendant while both the defendant and the informant were held within a city or county jail, state penal institution, or correctional institution. Nothing in this section limits or changes the requirements for corroboration of accomplice testimony pursuant to Section 1111.'" (*People v. Davis* (2013) 217 Cal.App.4th 1484, 1488, fn. omitted.)

We note that the trial court did not instruct the jury according to CALCRIM No. 336, on the need to view the testimony of an in-custody informant with caution, likely because the corroboration requirement was not added to CALCRIM No. 336 until August

19

2012, and the jury trial took place in March 2012. (See CALCRIM No. 336 (Aug. 2012 supp.) pp. 12-13.)

Despite this omission by the trial court, we cannot find prejudice.[5] "The standard of assessing prejudice under state law, as set out in *Watson, supra*, 46 Cal.2d at p. 836 [], should apply in cases such as this where the error involves failure to instruct the jury on the statutory requirement that the testimony of an in-custody informant must be corroborated by evidence that connects the defendant with the crime. In other words, we may reverse the judgment only if we are able to say it is reasonably probable the jury would have reached a result more favorable to defendant if the trial court had instructed that before the jury could convict defendant based solely on the testimony of . . . , an in-custody informant, there must be evidence that corroborates that testimony, i.e., that connects defendant to the commission of the crime. [Citation.]." (*People v. Davis, supra,* 217 Cal.App.4th at p. 1490.)

As we have noted, the jury was instructed that an in-custody informant was someone "whose testimony is based on statements the defendant allegedly made while both the defendant and the informant were held within a correctional institution." Hampton did not testify as to any statements that defendant made while they were in the holding cells. Moreover, this only applied to the time that Hampton and defendant were

---

[5] Respondent has argued that the failure to give the instruction on corroboration was not error as it was error to give CALCRIM No. 336 in the first place. However, once the trial court chose to give the in-custody informant instruction, it had to properly instruct the jury.

20

in the holding cells. As such, Hampton's statements to the police prior to trial and at trial did not need to be corroborated.

Moreover, even if the jury were to consider that Hampton testified to anything said by defendant while they were in the holding cells, such testimony was corroborated by Officer Dean who testified that defendant and Hampton were in cells next to each other and defendant offered Hampton a cellular telephone. As such, the trial court's error in giving CALCRIM No. 336, which was compounded by failing to additionally instruct the jury that it must find that any in-custody informant testimony must be corroborated, was clearly harmless in this case.

Based on the foregoing, despite the erroneous instruction with CALCRIM No. 336, the error was not prejudicial and reversal is not mandated.

IV

REJECTION OF STIPULATION THAT 8-TREY WAS A

CRIMINAL STREET GANG

Defendant contends that the trial court erred by refusing to accept his stipulation that 8-Trey was a criminal street gang and allowing the People to introduce evidence of the primary activities and predicate crimes of 8-Trey to show that they were a criminal street gang.

A. *Additional Factual Background*

Prior to trial, defendant offered to stipulate that 8-Trey was a criminal street gang for the purpose of the gang allegations and the active participation in a criminal street gang substantive crime. This essentially would eliminate the need of the People to

21

introduce evidence of the predicate crimes and the primary activities of the gang. This would leave the only question for the jury to resolve to be whether defendant was a member of the 8-Trey gang and if he committed the crimes on behalf of the gang.

The People objected to the stipulation, stating "Okay. I don't believe in stipulating the evidence away when it takes away the full force and effect of the evidence." Defendant's counsel argued that to reject the stipulation, the People were required to show the evidence was relevant beyond proving the elements of the crime. Whether other gang members committed crimes - - the evidence to establish a criminal street gang - - was not relevant to whether defendant committed the crime.

The trial court noted, "But I really think that the facts of the gang activity that will be received from the witness go to more than just proving the elements. It also goes to the whole essence of the allegation." The trial court further stated that the average juror had no idea about gang activities. "And so I do think that it's relevant that they understand the meaning of gangs, how they affect these kinds of cases. And they really need more than just '[t]his is a criminal street gang' to make their decisions in this case."

The trial court further examined the issue under Evidence Code section 352 and found the probative value was not outweighed by undue prejudice or undue consumption of time. The prosecutor was warned that the gang expert was to be "on and off as soon as possible." The trial court reiterated there was no case law supporting that the People had to accept a stipulation from the defendant on gang evidence.

B.      *Analysis*

The prosecution cannot be compelled to accept a stipulation "if the effect would be to deprive the state's case of its persuasiveness and forcefulness. [Citations.]" (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1007; *People v. Sakarias* (2000) 22 Cal.4th 596, 629.) "[A] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." (*Old Chief v. United States* (1997) 519 U.S. 172, 186-187.) A trial court's ruling on whether to force acceptance of a stipulation (which is essentially a ruling on the admission of evidence) is reviewed for abuse of discretion and will not be overturned unless it is arbitrary or capricious. (*People v. Waidla* (2000) 22 Cal.4th 690, 724.)

Here the proposed stipulation was to avoid admission of gang predicate offenses and primary activities necessary to establish criminal street gang status. (§ 186.22, subds. (e) & (f)). However, the People still had to prove that defendant actively participated in a criminal street gang, and willfully promoted, furthered, or assisted in felonious criminal conduct by members of the gang. (§ 186.22, subd. (a); see *People v. Lamas* (2007) 42 Cal.4th 516, 523.) In addition, the gang enhancement required the People to prove that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang with the "specific intent to promote, further, or assist" criminal conduct by gang members. (§ 186.22, subd. (b); see *People v. Williams* (2009) 170 Cal.App.4th 587, 639.)

Although gang evidence is potentially inflammatory (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223), this is not a case where acceptance of the stipulation would

23

have significantly reduced the amount of admissible gang evidence or reduced the impact of such evidence on the jury. The People would still have been entitled to admit a majority of Officer Prodigalidad's testimony regarding the 8-Trey gang to show that defendant was an active participant and the crime was committed on behalf of 8-Trey.

Moreover, the evidence was not unduly prejudicial under Evidence Code section 352. The fact that relevant and admissible gang evidence may prove damaging to the defense does not warrant its exclusion as overly prejudicial under Evidence Code section 352. (*People v. Karis* (1988) 46 Cal.3d 612, 638.) As noted, other relevant gang evidence was admissible as defendant did not offer to stipulate that he was an active member. The brief recitation of the primary activities of the gang and the predicate crimes did not consume an undue amount of time. The People were not obligated to accept the stipulation.

V

CALCRIM NO. 520

Defendant's second instructional error involves CALCRIM No. 520. It was given in conjunction with the gang instructions but defendant contends it had the potential to confuse the jury that it could find him guilty of attempted murder on a theory of implied malice.

A.    *Additional Factual Background*

The trial court noted that the predicate crimes for the gang instruction had to be defined and there was no objection. The jury was instructed, "[t]he instruction for each crime and allegation explains the intent and/or mental state required." The jury was

24

instructed as to attempted murder that the People must prove (1) that defendant took at least a direct but ineffective step toward killing another person; and (2) "The defendant intended to kill the person." The jury was further instructed, "A direct step indicates a definite and unambiguous intent to kill."

The jury was then instructed on the elements of the special allegation that the crimes of assault with a deadly weapon and attempted murder were committed on behalf of and for the benefit of a criminal street gang. It was instructed that in order to find that 8-Trey was a criminal street gang, it had to find that one or more of its primary activities was the commission of murder, attempted murder and assault. The jury was then instructed with a modified version of CALCRIM No. 520 as follows: *"This instruction is being provided to define one of the criminal activities in jury instructions 1400 and 1401. To prove that a person is guilty of this crime, the person [sic]*[6] *must prove that: . . . 2. When the defendant acted, he had a state of mind called malice aforethought; . . ."* Malice aforethought was defined as either express or implied malice and that proof of either was sufficient to establish the state of mind required for murder. It defined express malice as the intent to kill. It defined implied malice as a person intentionally committed an act, that he knew was dangerous to human life and he deliberately acted with conscious disregard for human life.

---

[6] The written instruction provided "People."

25

B.	*Analysis*

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.  [Citation.]"  (*People v. Ervine* (2009) 47 Cal.4th 745, 785.)  Attempted murder requires express malice, "that is, the assailant either desires the victim's death, or knows to a substantial certainty that the victim's death will occur.  [Citation.]"  (*People v. Booker* (2011) 51 Cal.4th 141, 178.)  "Intent to unlawfully kill and express malice are, in essence, 'one and the same.'  [Citation.]"  (*People v. Smith* (2005) 37 Cal.4th 733, 739.)

"It is now well established that a specific intent to kill is a requisite element of attempted murder, and that mere implied malice is an insufficient basis on which to sustain such a charge.  Accordingly, implied malice instructions should never be given in relation to an attempted murder charge.  [Citations.]"  (*People v. Lee* (1987) 43 Cal.3d 666, 670 (*Lee*).)

Relying primarily on *Lee* and *People v. Beck* (2005) 126 Cal.App.4th 518 (*Beck*), defendant argues that instructing the jury with CALCRIM No. 520 advised the jury that it could find him guilty of the substantive crime of attempted murder based on implied malice.  In *Beck*, the court reversed a defendant's conviction for attempted murder because the jury instructions and prosecutor's argument permitted a conviction of attempted murder based on implied malice, without a finding of intent to kill.  (*Id.* at pp. 521-523.)  In *Lee*, the trial court instructed the jury on both express and implied malice for attempted murder.  (*People v. Lee, supra,* 43 Cal.3d at p. 671.)

26

This case differs from *Lee* and *Beck*. Here, the jury was specifically instructed that the definition of murder, that included implied malice, only applied to the gang allegations in CALCRIM Nos. 1400 and 1401. We see no possibility that the jury understood the instructions as argued by defendant.

Further, even assuming the instructions had a potential to be confusing, there is no doubt that the jury found defendant had the intent to kill. In assessing error when an implied malice instruction is given for attempted murder, we consider whether the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Lee, supra,* 43 Cal.3d at p. 676.)

The jury's finding that the attempted murder was willful, premeditated and deliberate necessarily means it found an intent to kill. The jury was instructed that "[t]he defendant acted willfully if he intended to kill when he acted." By finding the premeditation and deliberation allegations true, they necessarily found he had an intent to kill.

Moreover, the prosecutor only argued to the jury that there was an intent to kill. As in *Lee*, where the court found the error in giving an instruction on implied malice was harmless, the prosecutor only focused on the jury finding of an intent to kill. (*People v. Lee, supra,* 43 Cal.3d at p. 677.)

Finally, the evidence of defendant's intent to kill was "quite strong." (*People v. Lee, supra,* 43 Cal.3d at p. 677.) Defendant had held a grudge against Hampton due to the prior altercation. When Hampton tried to talk to defendant, defendant stabbed him with a knife. Defendant stabbed him in the rib area, endangering many vital organs.

27

Williams had to intervene to keep him away. It was evident Hampton feared being a snitch and changed his trial testimony. There was no prejudicial error occasioned by the trial court instructing the jury with CALCRIM No. 520.

VI

CALCRIM NO. 604

Defendant's next instructional error claim pertains to the jury being charged with CALCRIM No. 604, which defines attempted voluntary manslaughter based on imperfect self-defense. He claims that the instruction improperly instructs the jury that the lesser offense of attempted voluntary manslaughter requires a "reduction" of the offense from attempted murder in violation of his rights to due process and proof of each element of the crime beyond a reasonable doubt because it creates a presumption of guilt in favor of the greater offense.

In the trial court below, defendant requested instruction on attempted voluntary manslaughter on a theory of imperfect self-defense. The trial court decided to give the instruction over the People's objection.

The jury was instructed with CALCRIM No. 604, in pertinent part, as follows: "An attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill a person because he acted in imperfect self-defense. If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime." The jury was then instructed on the elements of imperfect self-defense. The jury was instructed, "The People have the burden of proving beyond a reasonable doubt that the defendant was not

28

acting in imperfect self-defense.  If the People have not met this burden, you must find the defendant not guilty of attempted murder."

Initially, defendant did not object to this instruction at trial; in fact, he requested it. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights.  [Citations.]"  (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) We find no error or that it affected his substantial rights.

Defendant takes issue with the word "reduced" in CALCRIM No. 604, claiming it improperly implied that he was presumptively guilty of attempted murder unless the evidence showed otherwise.  When we review such a contention, the inquiry is whether there is a reasonable likelihood that the jury misunderstood and misapplied the challenged instruction.  (*People v. Smithey* (1999) 20 Cal.4th 936, 963.)  Moreover, jury instructions are not considered in isolation, but rather in the context of the entire charge and the arguments of the parties.  (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

CALCRIM No. 604's use of the word "reduced" does not create an impermissible inference of guilt of the greater offense.  The language merely states that attempted voluntary manslaughter is a lesser offense than attempted murder.  Using the word "reduced" is an appropriate way to describe what occurs when imperfect self-defense negates malice and mitigates the defendant's culpability from attempted murder to attempted voluntary manslaughter.  (See *People v. Rios* (2000) 23 Cal.4th 450, 461 ["[m]itigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter . . . ".)  CALCRIM No. 604 did not lessen the prosecution's burden of proof on the issue of imperfect self-defense.

29

Additionally, the jury was instructed as follows: "It is up to you decide the order in which you consider each crime and the relevant evidence, but I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime." Based on the instructions given as a whole, there is no reasonable likelihood that the jury would have applied the trial court's instructions unconstitutionally.

VII

CALCRIM NOS. 371 AND 372

Defendant's final instructional error claim takes issue with CALCRIM No. 371 (attempt to create false evidence or false testimony showing consciousness of guilt) and CALCRIM 372 (flight instruction). He maintains that both instructions created an impermissible inference of guilt in violation of his due process rights.

In the lower court, the jury was instructed, "If the defendant tried to create false evidence or obtain false testimony, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself." The jury was also instructed, "If the defendant fled or tried to flee immediately after the crime was committed or - - that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

30

Similar CALJIC instructions 0150 — 2.06 and 2.52 — have been approved by the California Supreme Court. (See *People v. Mendoza* (2008) 24 Cal.4th 130, 179-180 [rejecting that CALJIC No. 2.52 violates due process]; *People v. Morgan* (2007) 42 Cal.4th 593, 621 [rejecting that CALJIC No. 2.04 violates due process].) However, defendant argues that the phrase "aware of his guilt" in CALCRIM Nos. 371 and 372, instead of the phrase "a consciousness of guilt" that appears in CALJIC Nos. 2.06 and 2.52, and was approved by the California Supreme Court, changed the meaning so that these CALCRIM instructions now impermissibly presume the existence of guilt and lower the prosecution's burden of proof.

In *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, the appellate court rejected the exact same argument as it pertained to CALCRIM No. 372. (*Id.* at pp. 1158-1159.) We adopt the reasoning in that case, which equally applies to both CALCRIM Nos. 371 and 372. We reject defendant's claim.

VIII

PREMEDITATION AND DELIBERATION

Defendant argues the evidence of premeditation and deliberation was insufficient because there was no evidence of planning or reflection on his part. He asks this court to reduce his conviction from attempted premeditated murder to attempted murder.

"Our task is clear. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The

31

standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."' [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

To support a finding that an attempted murder was premeditated and deliberate, the evidence must show that the defendant's actions were "the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed.'" (*People v. Anderson* (1968) 70 Cal.2d 15, 27.) In determining the sufficiency of the evidence of premeditation and deliberation, there are three factors to consider: motive, planning activity, and the manner of killing. (*Id*. at pp. 26-27.) These factors are not exclusive and no specific combination of them need be present to conclude there is substantial evidence to support findings of premeditation and deliberation. (*People v. Stitely* (2005) 35 Cal.4th 514, 543; *People v. Koontz* (2002) 27 Cal.4th 1041, 1081.)

32

Defendant claims there was a complete lack of evidence to show planning or the mode of killing was indicative of a preconceived plan. We agree with defendant that it is likely that defendant just happened upon Hampton that night. However, it was clear that defendant had previously thought about seeing Hampton. He held a grudge against Hampton and labeled him a snitch. When defendant saw Hampton, he immediately decided to exact his revenge. There is no requisite minimum length of time between the prior reflection on killing a person and taking action to commit the killing. (*People v. Stitely, supra,* 35 Cal.4th at p. 543.) "'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citations.]" (*People v. Koontz, supra,* 27 Cal.4th at p. 1080.) Defendant clearly had a grudge against Hampton and quickly resolved to stab him. Additionally, as conceded by defendant, there was a motive for him to kill Hampton based on the prior altercation.

Defendant complains that the manner of killing suggests that there was no premeditation and deliberation. However, Hampton tried to talk to defendant and he ignored him. He called out "8-Trey" and immediately stabbed him with a knife he had in his possession. The manner of killing tends to show that defendant deliberated about killing Hampton. Moreover, the planning and motive evidence was sufficient to support the allegation.

There is substantial evidence upon which a rational trier of fact could find beyond a reasonable doubt that defendant acted with premeditation and deliberation to commit attempted murder.

33

## IX

## PROSECUTORIAL MISCONDUCT

Defendant claims several instances of prosecutorial misconduct were committed during closing argument that resulted in the denial of his state and federal constitutional rights.

A.    *Standard of Review*

"'The standards governing review of [prosecutorial] misconduct claims are settled. "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such '"unfairness as to make the resulting conviction a denial of due process."' [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." [Citation.] "In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review." [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" [Citation.]' [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 920.) In assessing prejudice, we "'do not lightly infer'" the jury drew the most damaging meaning from the prosecutor's statements. (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on a different point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

B.    *Doyle Error*

Defendant claims that the prosecutor's argument that defendant failed to contact Deputy Stanley despite him leaving a business card at his house constituted *Doyle* error. Deputy Stanley testified at trial that he had left his business card at a home belonging to defendant's grandmother on Windemere Way and defendant never contacted him. When defendant was arrested, the business card was found in defendant's car.

During discussion of the jury instructions, defendant's counsel asked that the trial court admonish the prosecutor not to discuss defendant's failure to contact the police after the incident even though Deputy Stanley left his card at his home. Defendant's counsel considered this *Doyle* error because he had no obligation to contact the police. The trial court agreed that the prosecutor could not state in argument why defendant did not contact Deputy Stanley. The trial court ruled that the prosecutor could comment that defendant had failed to contact Deputy Stanley despite having his business card, but the prosecutor could not speculate as to why he failed to contact him or to show his consciousness of guilt.

During the closing argument by the prosecutor, he stated as follows: "The defendant - - why the initial story to Mr. Hampton is the truth and the other one is the lie? Because the defendant actually lives on the street corroborates Mr. Hampton's story. Mr. Hampton said at the hospital the defendant lived on the street. What makes sense, too, is you can look at the consciousness of guilt. The defendant fled the scene, ran back in his grandma's house. Deputy Scott returned at 2 o'clock that morning the defendant was gone. Missing in action. [¶] Card was dropped off at the defendant's house. No phone

35

call was made. And two weeks later the defendant was arrested. And what you have to understand in finding which of these statements is the truth and what's important, what shows the truth is the statement in the medical records. And I don't if you guys remembered that one, but I'll put it up on the overhead. It's People's No. 2 for identification." There was no objection by defendant's counsel.

Defendant claims that this statement directly referenced his failure to contact the police, and directly connected it to the consciousness of guilt and flight. Such argument constituted an improper argument on his pre arrest, pre-*Miranda*[7] silence.

Initially, the People argue the argument was forfeited by counsel's failure to contemporaneously object and request a jury admonition. It is true that no prosecutorial misconduct can be shown due to the failure to object. (*People v. Clark* (2011) 52 Cal.4th 856, 960; *People v. Bonilla* (2007) 41 Cal.4th 313, 336.) However, since defendant also argues that if he waived the claim because of his counsel's failure to object to the instance of alleged misconduct, he received ineffective assistance of counsel, we will consider his claim that he was prejudiced by the comments.

*Doyle v. Ohio, supra,* 426 U.S. 610, "holds that the prosecution may not penalize a defendant for invoking *Miranda* rights during interrogation by using the invocation against the defendant at trial." (*People v. Lucero* (2000) 23 Cal.4th 692, 713.) The United States Supreme Court has yet to decide "the constitutionality of the use of

---

[7] *Miranda v. Arizona* (1966) 384 U.S. 436.

36

prearrest, pre-*Miranda* silence as substantive evidence of guilt." (*People v. Waldie* (2009) 173 Cal.App.4th 358, 365 [Fourth Dist., Div. Two].)

Here, we need not decide if the prosecutor committed misconduct, because even if there was *Doyle* error, on which we do not state an opinion, we would nonetheless find that such alleged misconduct was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. 18 at p. 24; see also *People v. Quartermain* (1997) 16 Cal.4th 600, 620-621.)

The jury was well aware of the testimony by Deputy Stanley that defendant had not contacted the police and defendant makes no argument on appeal that the evidence was improperly admitted. The jury could draw its own conclusion that defendant was avoiding the police. Moreover, as explained *ante* - - in addressing prejudice in giving the jury instructions and the evidence of premeditation and deliberation - - the evidence of defendant's guilt was substantial. Defendant was identified by Hampton, who Hampton knew. Defendant had a motive to commit the stabbing due to the prior altercation. Defendant was an 8-Trey member (whose name was called out during the stabbing) and he lived in the area where the stabbing occurred. Based on the substantial evidence of defendant's guilt, any misconduct was harmless beyond a reasonable doubt.

C.    *Argument on Premeditation and Deliberation*

Defendant additionally argues that the prosecutor committed misconduct in his argument as to premeditation and deliberation.

During closing argument, the prosecutor gave an example of premeditation and deliberation as follows: "The best way to explain premeditation and deliberation is to

37

give an example. You're driving down the street in the morning. You got your work on your front passenger seat and you have your coffee. You're late for work. And you're driving. And as you drive, you see the light go from green to yellow. So in your mind right then, you think, 'Well, I'm going to be late.' You look left. You look right, because you're looking for an officer so you don't get pulled over. You think about spilling your coffee, and you decide to go for it anyway. And how long did that take? A second? And in that second, you made that cold, calculated decision to go through that intersection. You weighed the consequences for and against, and you made the decision. You made a premeditated and deliberated - - you made a decision with premeditation and deliberation with that example."

Defendant claims that this misstated the law and this dishonest and improper method influenced the jury. He argues, "This comparison to the everyday act of driving was a mischaracterization designed to diminish the prosecution's burden on the issue of premeditation and deliberation." This minimized the seriousness of the matter being considered. Again, defendant's counsel failed to object to the argument and therefore the issue would be waived on appeal. (*People v. Clark, supra,* 52 Cal.4th at p. 960; *People v. Bonilla, supra,* 41 Cal.4th at p. 336.) [8] Anticipating that we would find such waiver, in the alternative, he argues that he received ineffective assistance of counsel.

---

[8]    Defendant argues that his important constitutional rights require that we ignore the failure to object and that no admonition to the jury would have cured the error. We disagree. Longstanding authority provides that an objection must be made and an admonition to follow the instructions on premeditation and deliberation would have cured any conceivable error.

There is no requisite minimum length of time between the prior reflection on killing a person and taking action to commit the killing. (*People v. Stitely, supra,* 35 Cal.4th at p. 543.) Thoughts may follow each other with great rapidity and cold, calculated judgment. (*People v. Koontz, supra,* 27 Cal.4th at p. 1080.) Here the prosecutor's argument was in-line with case law for premeditation. We find nothing objectionable in the argument. Further, any conceivable error was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24.) As noted *ante*, the evidence of premeditation and deliberation was substantial.

D.     *Denigration of Counsel*

Defendant's final claim of prosecutorial misconduct is that the prosecutor cast aspersions and attacked the integrity of his defense counsel. During the rebuttal argument, the prosecutor argued as follows: "When you have - - you're in a position you have the truth to fall back on. But is the truth being relied on by the defense? Are they relying on the truth? Or are they merely just trying to throw something at the wall and hope something sticks." Defendant objected that it was improper argument and shifted the burden of proof. The trial court overruled the objection.

Later the prosecutor argued, "[W]hy is he going to pick somebody he knew for 10 years? Why is he going to pick someone he went to high school with? And it doesn't make any sense if you're going to pick someone randomly, you're going to pick a gangster, especially if you're streetwise, especially if you know the streets and you know what's going to happen if you pick on a gangster and you call them out? [¶] What defense is suggesting is not reasonable. It's not supported by the evidence, and it's

39

unreasonable.  [¶]  And, look.  What did defense also do?  They're trying to have you focus over here, rather than focusing on the real facts of what happened."  Defendant's counsel objected as improper argument and the objection was overruled.

"'A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel.' [Citations.]  'In evaluating a claim of such misconduct, we determine whether the prosecutor's comments were a fair response to defense counsel's remarks' [citation], and whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion [citation]. '"  (*People v. Edwards* (2013) 57 Cal.4th 658, 738.)

We do not construe the prosecutor's argument, as argued by defendant, that it suggested that defense counsel "somehow violated ethical rules of practice" and was not seeking the truth.  Rather, the argument addressed the unreasonableness of the defense that was not supported by the evidence.  "'We accord the prosecutor wide latitude in describing the factual deficiencies of the defense case.' [Citation.]"  (*People v. Edwards, supra,* 57 Cal.4th at p. 740.)  There was no prosecutorial misconduct.  Further, any conceivable error was harmless based on the evidence, as set forth, *ante*.

X

ACTIVE GANG PARTICIPATION (§ 186.22, subd. (a))

In his opening brief, defendant contended that insufficient evidence was presented that he had sufficient knowledge of the criminal activities of 8-Trey to support his conviction of the substantive gang participation conviction under section 186.22, subdivision (a).  While respondent has disputed the evidence of knowledge was

insufficient, it has conceded in its brief that the conviction nonetheless must be reversed based on *People v. Rodriguez* (2012) 55 Cal.4th 1125, which was filed after the opening brief.

"The substantive offense defined in section 186.22[, subdivision] (a) has three elements. Active participation in a criminal street gang, in the sense of participation that is more than nominal or passive, is the first element of the substantive offense defined in section 186.22[, subdivision] (a). The second element is 'knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity,' and the third element is that the person 'willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang.' [Citation.]" (*People v. Lamas*, *supra*, 42 Cal.4th at p. 523.)

The California Supreme Court has held that the third element of the offense is not satisfied when a gang member commits a felony while acting alone. (*People v. Rodriguez, supra*, 55 Cal.4th at p. 1125.) The word "members," as the Supreme Court explained, "is a plural noun." (*Id*. at p. 1132.) "Therefore, to satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct. The plain meaning of section 186.22[, subdivision] (a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Ibid*.) The felonious criminal conduct referred to in the statute must be committed "'by members of that gang.'" (*Id*. at p. 1131.)

41

Here, there was no evidence presented that a fellow 8-Trey gang member was with defendant when he stabbed Hampton. Rather, Hampton stated that he was with his wife and children. As such, we agree with respondent that defendant's section 186.22, subdivision (a) conviction must be reversed. Since the trial court stayed the sentence on this count, there is no impact on the resulting sentence in this case.

XI

*ROMERO* MOTION

Defendant contends that the trial court erred by refusing to strike his prior felony conviction pursuant to his *Romero* motion.

A. *Additional Factual Background*

Defendant filed a written motion to strike his prior conviction of witness intimidation (§ 136.1, subd. (b)(1).) Defendant contended that this prior conviction was minor - - he grabbed a telephone away from his girlfriend during a domestic violence incident - - when compared with other felonious conduct. Defendant admitted his current offense was serious, but argued it was his first serious crime. His other criminal history involved relatively minor offenses.

As for his background, defendant had obtained his GED. Defendant's father died from substance abuse and his mother was in and out of prison. Defendant was married in 2007 and had five kids.

At the time of sentencing, the trial court assured defendant that he had reviewed all of the records in the case and seriously considered the *Romero* motion. The trial court noted that even if defendant's criminal history did not involve other serious violations, on

42

each of these minor convictions, he had violations of probation, failures to appear, and bench warrants. He refused to rehabilitate.

The trial court stated that defendant was very likeable and it was "astonishing" he was only 28 years old based on his criminal history. The current offense was "very serious;" one centimeter difference in the stabbing and Hampton could have died. It was clear it was a gang crime. Defendant had convictions in "2001, 2002, 2004, 2006, 2007, 2008, 2010 and 2011" and four involved domestic violence. He had several violations of probation. The prior convictions were not remote. He also presented a danger to society because he had never made an effort to change. The trial court ruled, ". . . I do not think that this young man falls outside of the three strikes scheme or spirit."

B. *Analysis*

We review the trial court's ruling refusing to strike a prior conviction for abuse of discretion. (*People v. Romero, supra*, 13 Cal.4th at p. 504; see also *People v. Carmony* (2004) 33 Cal.4th 367, 375.) The discretion the Supreme Court recognized in *Romero* is extremely limited, and may only properly be exercised in the unusual case where, "in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

"Because the circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls

once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*People v. Carmony*, *supra*, 33 Cal.4th at p. 378.)

Here, as recounted by the trial court, beginning in 1999, defendant had continuous contact with law enforcement. Although many of his convictions involved a probationary sentence, for almost every conviction he violated his probation. Defendant refused to rehabilitate. Further, defendant's conviction here was serious and was committed on behalf of the 8-Trey gang. As noted by the trial court, Hampton's death was averted only by one centimeter.

Based on defendant's criminal history and current convictions, the trial court's decision to not strike his prior conviction was neither irrational nor arbitrary. (*People v. Carmony, supra,* 33 Cal.4th at p. 374.)

## XII

### RESTITUTION FINE UNDER SECTION 1202.4, SUBDIVISION (B)

Defendant contends that the trial court erroneously imposed a $240 minimum restitution fine pursuant to section 1202.4, subdivision (b) because the minimum amount at the time he committed his crime was $200. Respondent concedes the error.

At sentencing, the trial court noted that the probation report recommended the imposition of a $5,000 restitution fine. However, the trial court disagreed and stated, "My intention was to - - I think I have to sentence him - - I have to order the $240

44

minimum. That would be my inclination on both of those." There was no objection by defendant's counsel. The trial court later stated, "He's to pay a restitution fine in the amount of $240. [¶] Pay an additional parole revocation restitution fine in the amount of $240. That's the minimum that the Court can order. And I do find he does have the ability to pay that."

Previously, section 1202.4 provided as follows: "The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, but shall not be less than two hundred dollars ($200). . . ." (Former § 1202.4, subd. (b)(1), Stats. 2011 ch. 45, § 1.) Effective January 1, 2012, the minimum restitution fine was increased to $240. (Stats. 2011, ch. 358, § 1.) "It is well established that the imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions. [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 143.)

Defendant committed his crimes on August 27, 2011, prior to the amendment to the statute. As such, application of the increased minimum fine would violate the prohibition against ex post facto laws. Here, the trial court clearly stated that it was imposing the minimum restitution fine and that it believed that to be $240. Such fine was improperly imposed. As such, we order that the restitution fine be reduced to $200, and the attendant parole revocation fine be reduced to $200.

# XIII

## DISPOSITION

The restitution fine imposed pursuant to section 1202.4, subdivision (b) shall be reduced to $200 and the parole revocation fine imposed pursuant to section 1202.45 shall also be reduced to $200, suspended unless parole is revoked.  In addition, we reverse defendant's conviction under section 186.22, subdivision (a).  The trial court is directed to prepare a new minute order for sentencing on April 13, 2012, and prepare an amended abstract of judgment.  The amended abstract of judgment shall be forwarded to the California Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


RICHLI_____
                    J.

We concur:


McKINSTER_____
        Acting P. J.


CODRINGTON_____
           J.